RECEIVED

OCT 30 2018

Clerk, U.S. District Court
Texas Eastern

UNDER SEAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
**Tyler Division**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. JULIA FLORES, and<br>     JOSEPH PETTIGREW, and<br><br>STATE OF TEXAS<br>ex rel. JULIA FLORES, and<br>     JOSEPH PETTIGREW,<br><br>     Plaintiffs,<br><br>v.<br><br>COMMUNITY HOSPITAL<br>     CORPORATION, INC.,<br>COMMUNITY HOSPITAL<br>     CONSULTING, INC., and<br>NACOGDOCHES COUNTY HOSPITAL<br>     DISTRICT, dba NACOGDOCHES<br>     MEMORIAL HOSPITAL,<br><br>     Defendants | **QUI TAM ACTION**<br><br>**FILED IN CAMERA<br>AND UNDER SEAL**<br><br><br>CASE NO. 6:18cv565<br>RWS |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

This Complaint is based upon a scheme conducted by the Defendants, COMMUNITY HOSPITAL CORPORATION, INC., COMMUNITY HOSPITAL CONSULTING, INC., and NACOGDOCHES COUNTY HOSPITAL DISTRICT, dba NACOGDOCHES MEMORIAL HOSPITAL, to defraud the United States of America and the State of Texas by submitting false and fraudulent claims against to the Medicare and Medicaid programs.

The Relators, Julia Flores and Joseph Pettigrew, through their undersigned counsel, acting on their own behalf and in the name of the United States and the State of Texas, bring this

civil action under the *qui tam* provisions of the federal and Texas False Claims Acts; and hereby allege the following:

## I. BACKGROUND

### A. Jurisdiction and Venue

1. This Court has original jurisdiction over this Complaint pursuant to the federal False Claims Act, 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345; and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(a).

2. Many of the alleged acts arose in the Eastern District of Texas; and the Defendants transacted business in Nacogdoches and Plano, Texas.  For these reasons venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a).

### B. The Defendants

1. Nacogdoches Memorial Hospital

3.      Defendant Nacogdoches County Hospital District, dba Nacogdoches Memorial Hospital ("NMH"), is a governmental unit and a political subdivision of the State of Texas.  It is located at 1204 N. Mound Street, in Nacogdoches, Texas; and primarily serves the low income and indigent community in Nacogdoches County, Texas.

4.  From in or about July 2014 until in or about January 2017, Scott Street ("Mr. Street") was the CEO of NMH.

5. At all times pertinent to this Complaint, NMH was under a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General of the U.S. Department of Health

and Human Services as a result of improper billing and documentation uncovered during a prior government investigation.

2.  The CHC Entities

6.  Defendant Community Hospital Corporation ("CHC Corp.," formerly known as VHA Southwest Community Health Corporation) is a Texas Corporation with its principal place of business in Plano, Texas.  CHC Corp. owns, manages and consults with hospitals, doing so through three distinct subsidiaries including Community Hospital Consulting, Inc. ("CHC Consulting").

7.  Defendant CHC Consulting is a Texas corporation with its principal place of business in Plano Texas.  It is a wholly-owned subsidiary of CHC Corp., with its principal place of business in Plano, Texas.  CHC Consulting specializes in the management and operation of smaller, community-based hospitals across the country, and serves as the management and consulting arm of CHC Corp.

8.  At times pertinent to this Complaint, the executives of CHC Corp. were employed by and compensated by CHC Consulting, which followed the compensation policies of CHC Corp.

9.  Among the CHC Corp. executives who at relevant times received retirement plan compensation from CHC Consulting were:

(a) David Butler, Secretary and Senior Vice President;

(b) Wilson Weber;

(c) James Hill, Assistant Secretary and Senior Vice President;

(d) Cynthia Matthews;

(e) Laurie Breedlove, Senior Vice President of Human Resources;

(f) Brian Doerr, Senior Vice President of Information & Security;

(g) Anthony Ybarra, Senior Vice President of CHC Supply Trust;

(h) Tod Beasley; and

(i) Craig Sims, Senior Vice President of Hospital Officers.

10.  At times pertinent to this Complaint, Michael D. Williams, was a director of both CHC Consulting and CHC Corp.

11.  At all times pertinent to this Complaint until in or about April 2017, Michael D. Williams was the President of both CHC Consulting and CHC Corp.

12.  At all times pertinent to this Complaint, James Hill was the Assistant Secretary and Senior Vice President of CHC Corp. and the Treasurer of CHC Consulting.

13.  At all times pertinent to this Complaint, David L. Butler was the Secretary and Senior Vice President of CHC Corp. and the Secretary of CHC Consulting.

14.  At all times pertinent to this Complaint, Cynthia Matthews was an executive of CHC Corp. and a Director and the Vice President of CHC Consulting.

15.  At all times pertinent to this Complaint beginning in or about January 2017 and continuing to on or about October 3, 2018, Gary Kendrick ("Mr. Kendrick") was the acting CEO of NMH and an officer of CHC Consulting; and beginning in or about April, 2017 and continuing to the date of this Complaint, Mr. Kendrick was the President and CEO of CHC Corp.

4. <u>The "Cleveland Group" and Its Shell Companies</u>

16.   At all times pertinent to this Complaint, there existed a group of individuals located in or near Cleveland Ohio, or otherwise associated with these individuals, (the "Cleveland Group") involved in the purchase of medical office buildings, hospital properties, and related properties at inflated prices; leasing those properties back to the sellers at inflated rents; and then selling the lease-back agreements to third party investors.

17.   Among the individuals and entities who were part of this Cleveland Group are the following:

(a) Mark J. Luttner ("Mr. Luttner"), a resident of Cleveland, Ohio.  He is a principal in the Luttner-Passov Investment Group based out of Cleveland, Ohio.

(b) Gary G. Habeeb (Mr. Habeeb"), a resident of Cleveland, Ohio.

(c) Gary Hooker (MR. Hooker"), a resident of Arkansas.

(d) 1600 CNB Corp., an Ohio corporation formed in 1974.

18.   Among the Ohio shell companies established by members of the Cleveland Group for the purpose of executing the fraudulent scheme described in this Complaint were the following:

(a) Healthcare Property Solutions, LLC ("HPS"), an Ohio limited liability company formed on August 26, 2016.  Gary Habeeb is its Managing Director. (Exhibit 1.)

(b)   MJL Texas LLC ("MJL Texas"), an Ohio for-profit limited liability company, formed on February 20, 2017 by 1600 CNB Corp..  Upon information and belief the term "MJL"

is taken from the initials of Mark J. Luttner; and the word "Texas" is based upon the transactions ongoing in Texas with NMH. (Exhibit 2.)

(c) NMH Phase 2 MOB, LLC ("NMH Phase 2"), an Ohio limited liability company formed on May 19, 2017.  Upon information and belief, the term "NMH" refers to Nacogdoches Memorial Hospital; and the term "MOB" refers to "Medical Office Building."  Gary Habeeb is a member of NMH Phase 2 and is its manager.  Mr. Luttner is also a member of NMH Phase 2. (Exhibit 3.)

19.  Among the Texas shell companies established by members of the Cleveland Group for the purpose of executing the fraudulent scheme described in this Complaint were the following:

(a) 1303 North Mound, LLC ("1303 Mound"), a Texas limited liability company formed on February 23, 2017.  Gary Habeeb is its Governing Person.  Mr. Luttner owns 100% of the Class A Interest of 1303 Mound; and NMH Phase 2 owns 100% of the Class A interest in the company. (Exhibit 4.)

(b) 1018 North Mound, LLC ("1018 Mound"), a Texas limited liability company formed on November 18, 2016.  Gary Habeeb was the company's organizer and is its Manager. (Exhibit 5.)

(c) 1002 North Mound, LLC ("1002 Mound"), a Texas limited liability company formed on February 20, 2017.  1600 CNB Corp. was its organizer; and Mr. Habeeb is its Manager. (Exhibit 6.)

### C. The Relators

20.  Plaintiff Julia Flores ("Ms. Flores") is a citizen of the United States and a resident of Pensacola, Florida; she is bringing this suit in the name of, and on behalf of, the United States of America and the State of Texas.

21.  Ms. Flores is the former Assistant Compliance Officer for NMH, having left her employment with NMH in July, 2017.

22.  Plaintiff Joseph Pettigrew ("Dr. Pettigrew") is a citizen of the United States and a resident of Nacogdoches, Texas; he is bringing this suit in the name of, and on behalf of, the United States of America and of the State of Texas.  He is personally bringing this suit as Plaintiff against CHC Corp., CHC Consulting, and NMH.

23.  Dr. Pettigrew is the former Chief Administrative Officer for NMH, having left his employment with NMH in February 2017.

24.  None of the allegations set forth in this Complaint are based upon a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing; in a congressional, legislative, or administrative or United States General Accounting Office, report, hearing, audit, or investigation; or in the news media.

25.  None of the allegations or transactions set forth in this Complaint are based on allegations or transactions that are the subject of a civil suit or an administrative penalty proceeding in which the State of Texas is already a party.

26.  Ms. Flores and Dr. Pettigrew are each an original source, within the meaning of 31 U.S.C. § 3730(e)(4)(B) and TEX. HUM. RES. § 36.113(b), of the information on which the allegations set forth in this Complaint are based, such information having been derived through

the employment of Ms. Flores and Dr. Pettigrew with NMH; and Ms. Flores and Dr. Pettigrew have each voluntarily provided such information to the government of the United States and the State of Texas prior to the filing of this Complaint.

## II. THE MEDICARE AND MEDICAID PROGRAMS

### A. The Medicare Program

27.   At all times pertinent to this Complaint, the Social Security Act (Title 42, United States Code, Sections 1395 et seq.) was in full effect, and had established the Medicare program, which provides medical insurance benefits for individuals sixty-five years of age or older, or to disabled individuals, who are entitled to Social Security benefits (hereinafter "Medicare beneficiaries").

28.   The United States Department of Health and Human Services ("HHS") is a department of the United States of America, the responsibilities of which at all times pertinent to this Complaint included the supervision and administration of the Medicare Program.

29.   The Centers for Medicare and Medicaid Services ("CMS") is an agency of the HHS, the responsibilities of which at all times pertinent to this Complaint included the operation, administration and implementation of the Medicare Program.

30.   The Medicare program, as amended, consists of several parts, including:

(a) Part A ("Medicare Part A"), which provides insurance for hospital services, hospital-related services, and services provided in non-hospital free-standing facilities for Medicare beneficiaries; and

(b) Part B ("Medicare Part B"), which provides insurance for outpatient services, and for medical services provided by physicians and other providers to hospitalized Medicare beneficiaries.

31.    The United States reimburses Medicare claims from the Medicare Trust Fund through CMS, which in turn, contracts the task of processing and paying Part A claims to private entities, each such entity known as an Medicare Administrative Contractor ("MAC").   Because of the volume of claims they must process, a MAC generally pays providers' or suppliers' claims for services in the first instance based on the provider's or supplier's representations that the services are billable under the applicable Medicare coverage rules.

32.    At all times relevant to this Complaint, HHS, through CMS, administered the Medicare Part A program in the State of Texas through Novitas Solutions, Inc. ("Novitas"), a MAC that processed and paid Medicare Part A claims on behalf of CMS.

1. CMS Form 855A: the Hospital Application for the Medicare Program

33.    At all times relevant to this Complaint, to participate in the Medicare Program, an institution such as a hospital, must apply for and be admitted into that program; and the application program for a hospital, including NMH, was CMS Form 855A.

34. Included as part of the CMS Form 855A was the following certification, in Section 15 of the form, to be signed by an official of the applying hospital for the purpose of binding that hospital to the certification (emphasis added):

> By his/her signature(s), the authorized official(s) named below and the delegated official(s) . . .  agree to adhere to the following requirements stated in this Certification Statement:

3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. *I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions* (including, but not limited to, the Federal anti-kickback statute and the Stark law), *and on the provider's compliance with all applicable conditions of participation in Medicare.*

35.  At all times pertinent to this Complaint, NMH participated in the Medicare program.

36.  On information and belief, based upon NMH's participation in the Medicare program, at an unknown time prior to the conduct and events alleged in this Complaint, through a delegated official, NMH signed the above quoted certification and bound itself to the terms of this certification for all times pertinent to this Complaint.

B. CMS Form 2552-10: the Hospital Cost Report

37.  At all times pertinent to this Complaint, a hospital seeking reimbursement from the Medicare Part A program, for capital, overhead, and other expenses incurred for home health services rendered by that hospital to Medicare Part A patients, submitted an annual cost report ("report") to the Medicare fiscal intermediary, CMS Form 2552-10; this cost report required the inclusion of revenues received from all patients, those with private insurance as well as Medicare beneficiaries, for the purpose of apportioning costs to the Medicare program and for determining appropriate payments to be made by the Medicare program.

38.  At all times pertinent to this Complaint, a cost report required that a hospital separately identify allowable expenses incurred by each hospital department; the percentage of the allowable cost which Medicare would pay a hospital for the expenses incurred by each

department would vary directly with the percentage of patients, treated by a department, which were Medicare beneficiaries.

39.   At all times pertinent to this Complaint, each cost report submitted by a hospital included a certification signed by the Chief Financial Officer or appropriate hospital administrator on behalf of that hospital.   This certification contained the following statements (capitalization in original):

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

* * * * *

> I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [Provider Name and Number] for the [specified] cost reporting period . . . and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

40.   At all times pertinent to this Complaint, a hospital submitting annual cost reports for a fiscal year would present monthly interim cost reports during that year to CMS through its MAC for the purpose of claiming interim payments under Medicaid Part A; and then submit an

11

annual fiscal year cost report that was used to reconcile the remaining outstanding payments then due and owing, or overpayments made, for the entire fiscal year.

41. At all times pertinent to this Complaint, the MAC for CMS in Texas, and therefore for NMH, was Novitas Solutions, Inc. ("Novitas").

42. At all times pertinent to this Complaint, CMS and Novitas relied upon the statements and certifications in those reports for determining whether and how much to compensate the hospital for services provided to Medicare patients; and these statements and certifications were material to CMS for making these decisions regarding for payments for care for such patients

### B. The Texas Medicaid Program

43. At all times pertinent to this Complaint, the Social Security Act (Title 42, United States Code, Section 1395 *et seq.*) was in full effect, and had established the Medicaid Program, which provides that each state must implement a plan for medical assistance; and provides compensation to health care providers who provide medical services and items to recipients who are indigent.

44. Pursuant to the Medicaid program, funding for the medical assistance programs of the states is partially provided by the United States and partially by the states.

45. At all times pertinent to this Complaint, the responsibilities of the HHS and CMS included the supervision of the Medicaid Program and the partial funding of this program.

46. The Texas Department of Health and Human Services ("Texas HHS") is department of the State of Texas, the responsibilities of which at all times pertinent to this Complaint included the supervision and administration of the Texas Medicaid Program.

47.   The Texas Health and Human Services Commission ("Texas HHSC") is an agency of the Texas HHS, the responsibilities of which at all times pertinent to this Complaint included the operation, administration and implementation of the Texas Medicaid Program.

48.   At all times pertinent to this Complaint, a hospital seeking reimbursement from the Texas Medicaid program for patient care submitted a copy of its annual CMS cost report, Form 2551-10, to the Texas HHSC for determining appropriate payments to be made by the Medicare program.

49.   At all times pertinent to this Complaint, the Texas HHSC relied upon the statements and certifications in those reports for determining whether and how much to compensate the hospital for services provided to Medicaid patients; and these statements and certifications were material to the Texas HHSC for making these decisions regarding for payments for care for such patients.

### III. THE FRAUDULENT SCHEME

50.   During 2016, NMH was in debt, and Mr. Street as NMH's CEO and the Board of Directors of NMH (the "NMH Board" or the "Board") sought a means to pay these debts.

51.   At an unknown time in or prior to 2016, Mr. Street hired Gary Hooker ("Mr. Hooker") as a consultant for NMH. At that time, Mr. Hooker was a financial consultant working as a sole proprietor in Arkansas.

52.   In or about August 2016, Mr. Hooker advised corporate officers of NMH, including Mr. Street and Mr. Pettigrew, that a group of financial and property brokers located in Cleveland, Ohio (the "Cleveland Group") purchased properties at inflated prices and then leased those properties back to the sellers at inflated rates, providing the sellers with upfront cash.  With

13

regard to NMH's real estate, Mr. Hooker described this as a means of "unlocking the value" of its assets.

53.   In or about August 2016, the proposal was presented to the NMH Board by Mr. Street and Mr. Hooker that NMH would sell properties to the Cleveland Group, at inflated rates, and lease them back at inflated rates.  The proposal included the following: (a) NMH would use the upfront money from the sales to pay down its debts and to expand its facilities; and then (b) use the increased money from the expanded facilities to pay off the inflated rents.

54.   As part of this presentation, buildings suggested for sale by NMH to the Cleveland Group were listed in a table captioned "Sale – Leaseback Targets Nacogdoches Memorial Health" (the "Leaseback Table") and was dated September 29, 2016.  (Exhibit 7.)  This table included properties not yet owned by NMH, but which NMH might acquire for the purpose of selling them to the Cleveland Group.

55.   The Leaseback Table identified ten target properties, with the following information provided for each property:

(a) the name of the property or its owner ("Name/Physician");

(b) its address;

(c) the square footage of the property ("Sq/Ft");

(d) the prospective rental rate, per square foot, for the building on the property (the "Lease Rt");

(e) the prospective total annual rental rate for the building on the property ("Annually");

(f) the prospective sale price for the property (the "Pay Out");

(g) the cost for NMH to acquire the property if it did not already own it (the "Cost to Acquire"); and

(h) the net upfront cash that NMH could recognize from the transaction with the Cleveland Group (the "Net").

56. The Board voted to proceed with the proposal.

57. During the period August 2016 through May 2017, NMH, CHC Corp., and CHC Consulting engaged in multiple transactions with the Cleveland Group, selling three buildings to it. These buildings were:

(a) the "Guniganti Building," having the address of 1303 North Mound Street, Nacogdoches, Texas;

(b) the "Elliott Building," having the address of 1018 N. Mound Street, Nacogdoches, Texas; and

(b) the "Coussons Building," having the address of 1002 North Mound Street, Nacogdoches, Texas.

58. The Cleveland Group purchased these buildings by establishing and then using multiple shell companies created in Ohio and in Texas.

**A. The Fair Market Rental Value for Medical Office Buildings Near NMH**

59. At the times pertinent to this transaction, an approximate fair market monthly rental value, per square foot, of medical office building space in the vicinity of the NMH and the Guniganti, Elliott, and Coussons Buildings (the "Specified Properties") was $11.90, as demonstrated by the following table describing such fair market rents:

**TABLE I**

| Property | Price | Delta from the Average | Absolute Deviation |
|---|---|---|---|
| **4610 North Street** | $12.00 | $0.10 | $0.10 |
| **235 N. University Dr.** | $12.00 | $0.10 | $0.10 |
| **100 North Street(Average)** | $9.00 | ($2.90) | $2.90 |
| **2717 Westward Dr.** | $15.00 | $3.10 | $3.10 |
| **3618 N. University Dr.** | $18.25 | $6.35 | $6.35 |
| **2407 North Street** | $12.00 | $0.10 | $0.10 |
| **838 University Dr.** | $9.36 | ($2.54) | $2.54 |
| **3801 North Street** | $12.00 | $0.10 | $0.10 |
| **422-424 North Street** | $7.50 | ($4.40) | $4.40 |
| | | | |
| **Average** | **$11.90** | — | **$2.19** |

60.  At the times pertinent to this transaction, NMH paid or collected rent at the following rates for space in medical office buildings:

**TABLE II**

| Property/ Owner | WW & CAH, Ltd. | Brad Wilson, M.D. | S. Uthamalingam, M.D. | Elliot Building |
|---|---|---|---|---|
| **Address** | 932 University Drive | 1023 N. Mound Street | 1004 N. Mound Street | 1018 Mound Street, Suite 106 |
| **Square Feet** | 3,526 | 1,512 | 1438 | 1690 |
| **Monthly Rent** | $4,113.00 | $1,700.00 | $1,800.00 | $1,250.00 |
| **Annual Rent** | $49,356.00 | $20,400.00 | $21,600.00 | $15,000.00 |
| **Monthly Price/Sq. Ft.** | $14.00 | $13.49 | $15.02 | $ 8.88 |
| **NMH is the:** | Tenant | Landlord | Landlord | Landlord |
| **Lease Date** | March 22, 2016 | March 9, 2016 | April 29, 2016 | October 25, 2013 |
|  |  |  |  |  |
| **Annual Rent Per Square Foot** | **$14.00** | **$13.49** | **$15.02** | **$8.88** |

61.   Using the data in Table II, above, an alternative amount for the approximate fair market rental value of medical office building space in the vicinity of the Guniganti Building was $12.85, as demonstrated by the following table:

**TABLE III**

| Property | Price | Delta from the Average | Absolute Deviation |
|---|---|---|---|
| **WW & CAH, Ltd.** | $14.00 | $1.15 | $1.15 |
| **Brad Wilson, M.D.** | $13.49 | $0.64 | $0.64 |
| **S. Uthamalingam, M.D.** | $15.02 | $2.17 | $2.17 |
| **Elliot Building** | $ 8.88 | ($3.97) | $3.97 |
|  |  |  |  |
| **Average** | $12.85 |  | $1.98 |

62.  The monthly rental rates, per square foot, for these facilities (the "Fair Market Rental Value" or the "FMRV") identified in Tables I through III, are $11.90 and $12.85.

## B. The Sale and Leaseback of the Guniganti Building

63.  At all times pertinent to this Complaint, GP Medical Building, LLC, was a Texas limited liability company.  Its members were Dr. Prabhakar Guniganti and Vijaya Pokala.

64.  At all times pertinent to this Complaint, Nacogdoches GP Medical Building, Ltd. (Nacogdoches GP") was a Texas partnership.  Its limited partners were Palavi Guniganti and Prathima Guniganti; and its general partner was GP Medical Building, LLC.

65.  At the time that the NMH Board voted to sell the Guniganti Building to the Cleveland Group, the building was owned by Nacogdoches GP.

66.  NMH purchased the Guniganti Building on or about October 13, 2017, for the purpose of selling it to the Cleveland Group.

### 1.  The October Transactions

67.  In preparation for the purchase of the Guniganti Building, the Cleveland Group established HPS in Ohio as a shell company.

68.  On or about September 21, 2016, NMS signed a "binding Letter of Intent (the BLOI) involving the sale of the Guniganti Building to HPS (Exhibit 8); HPS signed this BLOI on or about September 22, 2017.   At the time of the execution of this BLOI, NMH did not own the Guniganti Building.  Mr. Street signed the BLOI on behalf of NMH as its CEO; and Mr. Habeeb signed for HPS as its Managing Director.

69.  The BLOI called for the purchase of the Guniganti Building by HPS from its owner, identified as the GP Medical Building, L.L.C., and its subsequent "lease back" to NMH.

70.  Among the terms and condition in the BLOI were the following:

(a) The BLOI identifies the GP Medical Building, L.L.C. as the "Seller," and NMH as the "Tenant";

(b) No representative for the GP Medical Building, L.L.C. signed the BLOI, and there is no signature block for the GP Medical Building, L.L.C. or its representative;

(d) The sales price for the building is $3,750,000;

(c) Payments to be made for the purchase of the building total $3,750,000, and include $1,746,000 to Seller, this being the GP Medical Building, L.L.C., and $2,004,000 to the Tenant, this being NMH.

71.  Pursuant to the BLOI, NMH was to receive more than $2,000,000 for a building that it did not own; while the stated owner was to receive less than $1,750,000.

72.  On or about October 13, 2016, pursuant to a Purchase Agreement signed on behalf of NMH by Mr. Street (the "Purchase Agreement"), NMH purchased the Guniganti Building from the GP Medical Building, L.L.C. for $1,746,000.   In this Purchase Agreement, GP Medical Building L.L.C. was identified as "[doing business as] Nacogdoches GP Medical Building ("Seller")."  (Exhibit 9.)

73. On or about October 13, 2016, pursuant to an Assignment and Assumption of Purchase Agreement (the "First A&AP Agreement," Exhibit 10), NMH transferred its ownership

interest in the building to HPS while leasing the building back from HPS. The agreement explained this transaction as follows:

> WHEREAS, the parties hereto desire that Seller [GP Medical Building, L.L.C.] shall convey title to the Property to Assignee [HPS] and, that thereupon, Assignee [HPS] shall lease the premises back to Assignor [NMH], all in accordance with the terms and conditions of this Agreement. . . .

74. Pursuant to the First A&AP Agreement, the Purchase Agreement was assumed by HPS, and HPS was obligated to pay $1,746,000 to GP Medical Building, L.L.C.

75. Taken together, a result of the Purchase Agreement and the First A&AP Agreement was the following: HPS assumed ownership of the Guniganti Building, for which HPS paid $1,746,000 to GP Medical Building, L.L.C.; and HPS paid another $2,000,000 to NMH for a building that it had not owned.

76. Also on or about October 13, 2016, HPS and NMH entered into a Lease Agreement (the Guniganti Building Lease," Exhibit 11), whereby NMH leased the Guniganti Building from HPS for a term of twenty years with options to renew for two additional 10-year terms.  The annual rent is listed in Exhibit B to the lease, and begins at $24 per square foot, with an escalation clause of 2% per year: for the first year, the monthly rent is $24,400, and the annual rent is $292,800.; and for year twenty, the monthly rent is $35,546.19, and the annual rent is $426,554.31.

77. The ratio of the first year's monthly rental rate, per square foot, for the Guniganti Building ($24.00) is approximately **twice the rates of the Fair Market Rental Value**.

1. <u>The May Transactions</u>

77. On February 1, 2016, CHC Consulting assumed the management of NMH, and Gary Kendrick replaced Scott Street as the CEO of NMH.

78.  After assuming management of NMH, CHC Consulting restructured the sale and lease of the Guniganti Building with HPS, doing so through several shell companies; with these restructured transactions Nacogdoches GP Medical Building Ltd. transferred its the rights and interests in the building; and a newly formed Texas company, 1303 North Mound, LLC ("1303 Mound"), became the owner of the building.

79.  On February 20, 2017, Steven C. Bersticker, on behalf of 1600 CNB Corp., formed the shell company MJL Texas LLC ("MJL Texas") in Ohio.

80.  On February 23, 2017, MJL caused the shell company 1303 Mound to be formed in the state of Texas, with Mr. Habeeb as its Managing Member.

81.  On May 5, 2017, a second Assignment and Assumption of Purchase Agreement (the "Second A&AP Agreement," Exhibit 12) involving the Guniganti Building was executed between HPS and 1303 Mound.  Mr. Habeeb signed the agreement as the authorized representative of both entities: on behalf of the assignor, HPS, as its President; and on behalf of the assignee, 1303 Mound, as its Manager.

83.  The Second A&AP Agreement references an amended Purchase Agreement, dated September 27, 2016, whereby NMH purchased the Guniganti Building from GP Medical Building, L.L.C.

84.  On May 5, 2017, Nacogdoches GP Medical Building, Ltd. executed an Assignment of Warranties and Guarantees, transferring to 1303 Mound all of its "rights, titles, and interest in

and certain warrantees and guarantees" pertaining to the Guniganti Building and its multiple transfers among the entities discussed above. (Exhibit 13.)  This transfer was done by GP Medical Building, L.L.C. as general partner of Nacogdoches GP Medical Building, Ltd.  Dr. Guniganti signed for GP Medical Building, L.L.C.; and Mr. Habeeb signed for 1303 Mound.

85.  A Purchaser's Final Statement was issued by the Chicago Title Insurance Company, dated May 5, 2017 (Exhibit 14).

86.  According to the Purchaser's Final Statement:

(a) the purchaser of the Guniganti Building was 1303 Mound, and the Seller was Nacogdoches GP Medical Building, Ltd.

(b) the purchase price was $1,746,000;

(c) in addition to the purchase price, $2,004,000 was "allocated" to NMH;

(d) from the funds allocated to NMH, an "Additional Purchase Payment" was due to NMH in the amount of $1,829,600;

(e) an amount of $150,000 was described as "consulting fees" for HPS, paid by 1303 Mound  to NMH, and then from NMH to HPS;

(f) the gross amount due from the Purchaser was $3,876,328.25;

(g) the settlement date was May 5, 2017, which was the date that HPS transferred its interest in the Guniganti Building; and

(h) the statement was signed by Gary Habeeb as the manager on behalf of 1303 Mound.

87. The transfer of the deed for the Guniganti Building, from the Nacogdoches GP Medical Building Ltd. to 1303 Mound was recorded on May 10, 2017.

3. <u>The After Events: Transferring the Guniganti Building to an Investor</u>

88.   On May 19, 2017, Harold O. Maxfield, Jr., on behalf of CFD Service Co., Inc., formed NMH Phase 2 MOB, LLC ("NMH Phase 2").   Upon information and belief the term "Phase 2" refers to the transactions involving the Guniganti Building, as initially identified in the Leaseback Table.  (Exhibit 7.)

89.  Both Mr. Habeeb and Mr. Luttner are members of NMH Phase 2; and Mr. Habeeb is the company's manager.

90.   According to the Operating Agreement for 1303 Mound, the company has two members: MJL Texas, which owns 100% of the Class A Interest; and NMH Phase 2, which owns 100% of the Class B Interest. (Exhibit 15.) The operating agreement sets forth the purposes of the company as being the following:

> The purposes of the Company are: (i) to acquire, develop, own, hold, sell, lease, transfer, exchange, manage and operate the real property located in the City of Nacogdoches, County of Nacogdoches and State of Texas, *commonly known as 1303 North Mound Street, Nacogdoches, Texas, 75961*, and more particularly described on the attached Exhibit A (the "Property") . . . .

(Emphasis added.)

91.   Taken together, the result of the Purchase Agreement and the First and Second A&AP Agreements was that: (a) 1303 Mound purchased the Guniganti Building, which was worth approximately $1,750,000, for the price of $3,876,328.25, or approximately twice its fair market value; and (b) NMH leased back the office space in this building for approximately double its fair market value.

92.  On September 29, 2017, the Lease on the Guniganti Building, with NMH as the lessee, was assigned from 1303 Mound to Stearns Investment 16, LLC ("Stearns 16").  (Exhibit 16).   Stearns 16 is a Texas limited liability company, formed on September 18, 2017.

93.  On an unknown date prior to June 19, 2018, ownership of the Guniganti Building was transferred to Stearns 16.

94.  After the transactions were completed, Mr. Hooker told Pettigrew that he, Hooker, had received "about" $100,000 on the Guniganti deal.

### C. The Sale and Leaseback of the Elliott Building

95.  At the time that the NMH Board voted to sell the Elliott Building to the Cleveland Group, the building was owned by NMH.

96.  On or about September 16, 2016, NMH and HPS executed a Purchase Agreement for Sale and Leaseback for the Elliott Building, located at 1018 North Mound Street, Nacogdoches, Texas, whereby HPS purchased the building from NMH. (Exhibit 17.)  Mr. Habeeb signed the agreement for HPS, and Mr. Street signed it for NMH.  The purchase price was $5.5 million.

97.   On information and belief, the market value of the Elliott Building was approximately one-half of the price at which NMH sold it to HPS.

98.  On November 18, 2016, Mr. Habeeb formed 1018 North Mound Street, LLC ("1018 Mound") in Texas. (Exhibit 5.)

99.   Sometime on or between November 18, 2016 and December 15, 2016, HPS transferred ownership of the Elliott Building to 1018 Mound.

100.   On or about December 15, 2016, NMH (as Lessee) and 1018 Mound (as Lessor) executed a Lease (the "1018 Lease"). (Exhibit 18.)  This Lease was signed on behalf of NMH by Mr. Street.

101.   The term of the 1018 Lease is fifteen years, commencing on December 15, 2016. The initial annual rent was $20 per square foot, with an annual 2% rental escalation provision. The number of square feet is 22,656; and the first year's annual rent was $453,120.

102.   NMH had previously rented space in the Elliott Building to Larry Walker, M.D. (Exhibit 19, the "Walker Lease").  The annual rent per square foot under that lease agreement was $8.88.  This Lease was signed on behalf of NMH by Mr. Kendrick as the Interim CEO for NMH, on or about October 25, 2013.

103.   Taken together, the result of the above transactions was that: (a) HPS purchased the Elliott Building, which was worth approximately $2,750,000, for the price of $5,500,000, or approximately twice its fair market value; and (b) NMH leased back the office space in this building for approximately double its fair market value.

### D. The Sale and Leaseback of the Coussons Building

104.   At the time that the NMH Board voted to sell the Coussons Building to the Cleveland Group, the building was owned by NMH.

105.   On or about September 27, 2016, NMH sold the Coussons Building, located at 1002 North Mound Street, Nacogdoches, Texas, to HPS.  Upon information and belief, the purchase price was $2.5 million.

106.   On information and belief, the market value of the Coussons Building was approximately one-half of the price at which NMH sold it to HPS.

107.   Also on September 27, 2016, NMH (as Lessee) and HPS (as Lessor) executed a Lease (the "HPS-Coussons Lease"). This Lease was signed on behalf of NMH by Mr. Street. (Exhibit 20.)

108.   The HPS Coussons Lease was for a term of 15 years with an annual rent per square foot of $24, again with a 2% annual rental escalation provision.  The number of square feet is 9,435; and the first year's total rent was $226,440.00.

109.   On February 23, 2017, 1600 CNB Corp. formed 1018 North Mound Street, LLC ("1018 Mound") in Texas.  Mr. Habeeb was its Governing Person. (Exhibit 6.)

110.   On May 5, 2017, HPS transferred its interests in the Coussons Building to 1002 Mound.   Mr. Habeeb executed the Assignment and Assumption of Purchase Agreement implementing this transfer for HPS, as its President; and for 1002 Mound, as its Manager. (Exhibit 21.)

111.   On May 5, 2017, NMH (as Lessee) and 1002 Mound (as Lessor) executed a Lease (the "1002 Lease"). (Exhibit 22.)  This Lease was signed on behalf of NMH by Mr. Kendrick and on behalf of 1002 Mound by Mr. Habeeb.

112.   The term of the 1002 Lease is fifteen years, commencing on May 5, 2017. The initial annual rent was $24.25 per square foot, with an annual 2% rental escalation provision. The number of square feet is 9,435; and the first year's annual rent was $228,798.75.

113.   The ratio of the first year's monthly rental rate, per square foot, for the Coussons Building ($24.00 or $24.25) is approximately **twice the rates of the Fair Market Rental Value**.

114.   Taken together, the result of the above transactions was that: (a) HPS purchased the Coussons Building, which was worth approximately $1,250,000, for the price of $2,500,000, or approximately twice its fair market value; and (b) NMH leased back the office space in this building for approximately double its fair market value.

### E. The Inflated Rents in the Cost Reports

115.   By email correspondence dated October 11, 2016, Mr. Street, then the CEO of NMH, confirmed that the Subject Properties were being used for NMH business and for the furnishing of items or services that were reimbursable by federal programs.  In pertinent part, Mr. Street (in Bold) answered questions about the transactions involving the Subject Properties:

> NMH (1) purchases buildings, clinics, houses, and lots; (2) sell them to a property-development company in Cleveland Ohio; and (3) leases the buildings from this company. We understand that there are two lots that are being purchased and will be permanent hospital property.

> Question 1: Is it correct that the buildings, clinics, houses, and lots are *not* being used for NMH's own business or for the furnishing of items or services that may be reimbursed by Federal health care programs *before* the sale to the property-development company?

> **ANSWER: NO they are being used for business**

116.   In the same email, Mr. Street confirms that NMH will continue to use the properties as before, that is, for the furnishing of items or services that is reimbursable by federal programs:

> Question 3: What are the buildings / property being used for after they are leased back or purchased?

**ANSWER: The same business as they are now.**

117.  In this same email, Mr. Street confirms that the Elliott building—at least in part—will be occupied by NMH-employed-physicians, and therefore can be considered as NMH overhead in addition to the fact that it used for administrative purposes.  In addition, other physicians will occupy space and pay rent to NMH:

> NMH is selling the administration building (Elliott building) to the property-development company and then leasing it from the company, and the physicians that are in this building will pay NMH rent for their offices.

**ANSWER: Employed physicians we pay their rent, the other that are not employed they pay us rent.**

118.  On March 6, 2017, Mr. Kendrick, now the CEO of NMH, sent out an email explaining that the closings on the Guniganti and the Coussons Buildings would occur on the same day.

119.  On April 17, 2017, Mr. Kendrick sent an email confirming that these deals were not yet done, but that the documents were being finalized.

120.  After the May 2017 transactions were completed, Mr. Kendrick sent an email explaining the transactions and the use of the buildings going forward as follows:

> The assignment was basically a quick transfer from Dr. G[uniganti] to the firm that bought it...........we have the Master Lease now on both buildings.......The services are physician offices........and that will continue........
>
> If it's not one of our doctors in the space, then whomever is leasing does pay us..........if it's an employed doctor, of course they don't pay rent..........  And yes, since we have the Master Lease, we pay the new owners of the building the lease payments............

121.  At all times pertinent to this Complaint, NMH outsourced the preparation of its cost reports to BKD, an accounting business.

122. Julia Flores participated in meetings concerning the hospital's finances.   During these meetings, the total rents for the buildings were discussed as being included in the hospital's expenses for purposes of inclusion in cost reports.

123.   The financial data concerning the building transactions had two effects for purposes of the reports: while the sale of property decreased the assets of NMH, lowering reimbursement, the assumption of rents raised its cost/to reimbursement ratio, raising its reimbursement.   The payment of inflated, as opposed to fair market value, rents resulted in the cost/to reimbursement also being inflated, and caused NMH's cost reports submitted to the Medicare and Medicaid programs to be false and fraudulently inflated.

124. After Joe Pettigrew left NMH, he continued to communicate with Gary Hooker, including discussions of a purchase and lease-back of a healthcare clinic in Lufkin, Texas.   Mr. Hooker left the following voice mail message for Mr. Pettigrew:

> Hey Joe, this is Gary Hooker. Hope, hope you're doing okay. Ummm, wanted to follow up on that clinic, in Lufkin that you had talked about. Umm, I have um, been talking to, my contact in Cleveland and we definitely would be interested in looking at that. And just so you know, I wah uh ah, you get whatever I get. So, we'll, we'll split it. Um, and for, just for information, I made about a hundred grand on the Elliot Building and the Coussons Building. So, that would be, now I don't, I don't know how big this building is, if it would be the same or not. But, either way, we'll, we'll, we will do pretty good for the work that we put in to it. So really it's the, that's the prime to leave, and might have to gather some information. But, uh so give me a ch-, uh give me a call back when you get a chance if, if they haven't moved on to somebody else, but uh cause I would like to follow up with them. My number is [redacted]. Thanks Joe, bye.

125.   Mr. Pettigrew and Mr. Hooker had another conversation during which Mr. Hooker explained that the average "commission" on these transactions for people bringing a deal to the Cleveland Group's attention was 10%.

**COUNT ONE**

**False Claims: CMS Cost Reports**

**31 U.S.C. § 3729(a)(1)(A) (amended May 20, 2009)**

126. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs one through 125 of this Complaint and further allege:

**A. Medicare Cost Reports**

127.   Hospital cost reports include entries for "cost centers." A cost center is a department within a hospital that does not directly add to profit but still incurs expenses for the hospital to operate. Cost centers only contribute to a hospital's profitability indirectly, unlike a profit center, which contributes to profitability directly through its functions

128.  Expenses may be "reclassified" on cost reports, from one cost center to another.

129.  A cost report incorporates numerous worksheets, including a "Worksheet A," which provides for recording the trial balance of expense accounts from a hospital's accounting books and records.  It also provides for the necessary reclassifications and adjustments to certain accounts and cost centers.

130.   A sub-worksheet, Worksheet A-6, incorporated in Worksheet A, is used to reclassify expenses, including the reclassification of rental expenses.  This is explained as follows in the Medicare Reimbursement Manual:

> Reclassification of rent expenses included in the Administrative and General cost center which is applicable to the rental of buildings and fixtures and to movable equipment from other than related organizations . . . .

131.  Expenses in a cost report are categorized by "classes."  The sum of all expenses reclassified among classes must equal zero.

132.  For the purposes of Medicare regulations and cost reporting, the proper measurement of the reimbursable expenses after the purchase and leaseback of a property is the cost of ownership that the hospital would have incurred for maintaining the property had the hospital retained title:

> For sale and leaseback agreements for hospitals . . . entered into on or after October 23, 1992, the amount a provider may include in its capital-related costs as rental or lease expense may not exceed the amount that the provider would have included in its capital-related costs had the provider retained legal title to the facilities or equipment, such as interest expense on mortgages, taxes, depreciation, and insurance costs (the costs of ownership). This limitation applies both on an annual basis and over the useful life of the asset.

42 C.F.R. § 413(b).

133.   At all times pertinent to this Complaint, none of the Specified Properties had mortgages.  The depreciation amounts would be based on the costs of the properties when they were purchased by the hospital—and not on the inflated costs for which they were sold.

134.  The base tax for each of the Specified Properties for the year 2017 was:

| Property | Address | Base Tax | Base Annual Rent |
|---|---|---|---|
| Guniganti Building | 1303 N. Mound St. | $30,297.60 | $292,800.00 |
| Elliott Building | 1018 N. Mound St. | $13,196.09 | $453,120.00 |
| Coussons Building | 1002 N. Mound St. | $6,775.17 | $226,440.00 |
| **Totals:** | — | **$50,268.86** | **$972,360.00** |

135.   The remaining costs of ownership are minimal.  Taken together, the obligations assumed by the hospital for the new rents on the Specified Properties were significantly more than the costs of ownership.

136.   The Specified Properties were used by NMH for the following purposes: (1) as administrative offices (in the Elliott Building); and (2) as physician offices, for private physicians who worked for the hospital.

## B. NMH's Manipulation of Its Costs Reports

137.   Beginning on an unknown date prior to November 2016 and continuing until an unknown date beyond the date of this Complaint, NMH presented to CMS annual cost reports and monthly interim cost reports for reimbursement under the Medicare program.

138.   In or about March 2016, Mr. Scott replaced Jane Ann Bridges as the Chief Financial Officer of NMH with Cristin Croford.  Mr. Scott then retained Gary Hooker on behalf of NMH as a financial consultant to "assist" Ms. Croford.  Thereafter, Mr. Hooker handled the financial aspects of the transactions between NMH and the Cleveland Group concerning the Specified Properties.

139.   On information and belief, Mr. Hooker, acting in concert with Mr. Street, Mr. Kendrick, CHC Corp. and CHC Consulting, provided incorrect, fraudulent, and inflated data concerning the financial transactions involving the Specified Properties to BKD, causing BKD to prepare false and fraudulent cost reports for presentation to CMS and the State of Texas.

140.   Among the annual cost reports that NMH presented to CMS is that for Fiscal Year ending June 30, 2017 (FY 2017 cost report) (Exhibit 23).

141.   Because expenses for physician offices are reimbursable under Medicare Part B, such expenses are not reimbursable under Medicare Part A and allocated to a non-reimbursable cost center for the purposes of Medicare reimbursement through a cost report.

142.   Capital expenses for movable equipment are reimbursable under Medicare Part A, and therefore are reimbursable through a hospital cost report.  They are allocated to the "Capital Related Costs-Movable Equipment" cost center.

143.   The cost center for "Capital Related Costs-Movable Equipment" is a general services cost center, which is defined in Worksheet N-1 as follows:

> General service cost centers include expenses incurred in operating the facility as a whole that are not directly associated with furnishing patient care such as, but not limited to mortgage, rent, plant operations, administrative salaries, utilities, telephone, and computer hardware and software costs. General Service cost centers furnish services to other general service cost centers and to reimbursable and non-reimbursable cost centers.

1. Fraudulent Statements Regarding New Leases

144.   On Worksheet S-2, Part II, appears the following questions that NMH was obligated to answer as a cost reimbursed hospital:

(a) "Were new leases and/or amendments to existing leases entered into during this cost reporting period? If yes, see instructions."  (Line 24.)

(b) "Have there been new capitalized leases entered into during the cost reporting period? If yes, see instructions. (Line 25.)

145.   NMH knowingly and intentionally omitted answering either question, hiding from and materially misleading CMS that NMH had entered into purchase and leaseback agreements for the Specified Properties with HPS and the other shell companies operated by the Cleveland Group.

146.   At all times pertinent to this Complaint, the answers to these questions were material to the decisions of CMS and Texas HHS as to whether to make payments in whole or in part for the amounts sought in cost reports.

2. Offsetting Reimbursable and Non-Reimbursable Cost Centers

147.   Worksheet A-6 of NMH's FY 2017 cost report lists 31 "Rent Leases" as "Decreases" for the purpose of Reclassification.  They are listed under "Reclassifications," for "G – Rent Leases."  The total of these 31 rent lease decreases is $2,106,988 (the "Total of the Rent Leases Decreases").

148. Line 30 on Worksheet A-6 identifies physician offices (Entry "192.00" in Column 7) as accounting for $ 958,086 of the Total of the Rent Lease Decreases.

149.  NMH offset the Total of the Rent Lease Decrease on its FY 2017 cost report by an equal increase, in the amount of $2,106,988, doing so on "Line 2" of Worksheet A, Part III, under "Summary of Capital."  This is the line item for the "Capital Related Costs-Movable Equipment" cost center.

150.  By this manipulation of its costs reports, NMH fraudulently moved expenses from a non-reimbursable cost center, for physician offices, into a reimbursable cost center, for "Capital Related Costs-Movable Equipment.

151.  At all times pertinent to this Complaint, the above described entries made in cost reports and the worksheets incorporated in cost reports were material to the decisions of CMS and Texas HHS as to whether to make payments in whole or in part for the amounts sought in cost reports.

34

2. Inflating the Rental Amounts

152.  NMH listed its itemized expenses for non-reimbursable cost centers on Lines 190 through 194 of Worksheet A, with expenses for physician offices listed on Line 192.  Included on this line are the "Total" (Column 3); "Reclassifications" (Column 4); and "Net Expenses for Allocation" (Column 7).

153.  NMH included the inflated rents, as specified in its leaseback agreements with HPS and the other shell companies formed by the Cleveland Group, for the Specified Properties, doing so on Line 192 of Worksheet A, thereby inflating the amounts for its Total expenses, entered on Line 200, Columns.

154.  NMH listed its itemized expenses for general services cost centers on Lines 1 through 23 of Worksheet A, with expenses for Capital Related Costs-Movable Equipment listed on Line 2.  Included on this line are the "Total" (Column 3); "Reclassifications" (Column 4); and "Net Expenses for Allocation" (Column 7).   The entry for "Reclassifications" is positive $ 2,871,019.

155.  NMH included in its capital-related costs as rental and lease expense amounts in excess of what its costs of ownership would have been had NMH retained legal title to the Specified Properties, doing so on Line 2 of Worksheet A, thereby inflating the amounts for its Total expenses, entered on Line 200.

156.  NMH listed its operating expenses on Lines 29 and 43 of Worksheet G-2, Part II, taken from Worksheet A, Line 200, which includes the total costs for the hospital (reimbursable and non-reimbursable, including general service cost center).

157.  At all times pertinent to this Complaint, the above described entries made in cost reports and the worksheets incorporated in cost reports were material to the decisions of CMS and Texas HHS as to whether to make payments in whole or in part for the amounts sought in cost reports.

## C. The Claims

158.  Beginning in or about October 2016, and continuing until an unknown date after the date of this Complaint, Defendants NMH, CHC Consulting, and CHC Corp. knowingly presented, or caused to be presented, to the United States Government for payment or approval, false or fraudulent claims, these claims being the above described Medicare reimbursement requests submitted on the annual cost report for FY 2017; such cost report, for each Defendant, being in violation of 31 U.S.C. § 3729(a)(1).

159.  Beginning in or about July 2017, and continuing until an unknown date after the date of this Complaint, Defendants NMH, CHC Consulting, and CHC Corp. knowingly presented, or caused to be presented, to the United States Government for payment or approval, false or fraudulent claims, these claims being the annual cost reports for fiscal years subsequent to FY 2017 that, upon information and belief, contained the same or substantially equivalent false information contained in the above described the annual cost report for FY 2017; each such cost reports, for each Defendant, being in violation of 31 U.S.C. § 3729(a)(1).

160.  Beginning in or about October 2016, and continuing until an unknown date after the date of this Complaint, Defendants NMH, CHC Consulting, and CHC Corp. knowingly presented, or caused to be presented, to the United States Government for payment or approval, false or fraudulent claims, these claims being monthly, interim cost reports that, upon

information and belief, contained the same or substantially equivalent false information contained in the above described annual cost report for FY 2017; such cost report, for each Defendant, being in violation of 31 U.S.C. § 3729(a)(1)(A).

161.  As a result of the conduct of the Defendants, as described in this Complaint, the United Sates suffered actual damages.

## COUNT TWO
## False Statements: CMS Cost Reports
## 31 U.S.C. § 3729(a)(1)(B) (amended May 20, 2009)

162. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs one through 125, and paragraphs 127 through 160 of this Complaint and further allege:

163.  Beginning in or about October 2016, and continuing until an unknown date after the date of this Complaint, Defendants NMH, CHC Consulting, and CHC Corp. knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government, these records and statements being the above entries in the annual and monthly cost reports; each such instance being in violation of 31 U.S.C. § 3729(a)(1)(B).

164.  As a result of the conduct of the Defendants, as described in this Complaint, the United Sates suffered actual damages.

**COUNT THREE**
**Conspiracy**
**31 U.S.C. § 3729(a)(1)(C) (amended May 20, 2009)**

165. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs one through 125, and paragraphs 127 through 160, and paragraphs 163 of this Complaint and further allege:

166. Beginning in or about October, 2016 and continuing until an unknown date after the date of this Complaint, Defendants NMH, CHC Consulting, and CHC Corp. conspired together and with Mr. Street, Mr. Kendrick, and Mr. Hooker to commit the violations of 31 U.S.C. § 3729(a)(1)(A) and (B); such conduct being in violation of 31 U.S.C. § 3729(a)(1)(C).

167. As a result of the conduct of the Defendants, as described in this Complaint, the United Sates suffered actual damages.

**COUNT FOUR**
**False Claims: Texas Medicaid Cost Reports**
**TEX. HUM. RES. CODE §§ 36.002 AND 36.052**

168. The Plaintiffs reallege and reincorporate by reference the allegations contained in paragraphs one through 125, and paragraphs 127 through 160, and paragraph 163 of this Complaint and further allege:

169. Beginning in or about October 2016, and continuing until an unknown date after the date of this Complaint, the Defendants NMH, CHC Consulting, and CHC Corp. knowingly made, or caused to be made, to the State of Texas for payment or approval, false statements and misrepresentations of material fact to permit NMH to receive payments under the Medicaid program that were greater than the payments authorized or fraudulent claims, these false

statements and misrepresentations being the above entries in the annual and monthly cost reports; such cost report, for each Defendant, being in violation of TEX. HUM. RES. CODE §§ 36.002 AND 36.052.

170.   As a result of the conduct of the Defendants, as described in this Complaint, the State of Texas suffered actual damages.

**Request for Relief**

The Plaintiffs, Julia Flores and Dr. Pettigrew, acting on behalf of and in the name of the United States and the State of Texas, hereby demand and seek that judgment be entered in favor of the United States and the State of Texas, and against the Defendants Community Hospital Corporation, Inc.; Community Hospital Consulting, Inc., and Nacogdoches County Hospital District, dba Nacogdoches Memorial Hospital, for each count in which the Defendant is named, as follows:

<u>Under the Federal False Claims Act</u>

1. For treble damages incurred by the United States;

2. For civil penalties of twenty-one thousand nine hundred sixteen dollars ($21,916) for each false claim submitted to the United States;

3. For civil penalties of twenty-one thousand nine hundred sixteen dollars ($21,916) for each false record and statement made or used to get false claims paid or approved, in the form of the above described cost reports.

4. For interest on: the above treble damages, from the date on which the damages were incurred; and on the above civil penalties, from the date on which this Complaint is served upon the Defendant;

5. For all costs and expenses of this civil action; and

6. For such other and further relief as the Court deems just and equitable.

<u>Under the Texas Medicaid Fraud Prevention Act</u>

7. For treble damages incurred by the State of Texas;

8. For civil penalties of twenty-one thousand nine hundred sixteen dollar ($21,916) for each false statement and misrepresentation of material fact made or used to get Medicaid payments for cost reports presented to the Texas HHS.

9. For interest on: the above treble damages, from the date on which the damages were incurred; and on the above civil penalties, from the date on which this Complaint is served upon the Defendant;

10. For all costs and expenses of this civil action; and

11. For such other and further relief as the Court deems just and equitable.

In addition, the Plaintiffs, each acting on his or her own behalf, demand and seek that an award be made in their favor as follows:

1. For thirty percent (30%) of the proceeds collected by the United States;

2. For thirty percent (30%) of the proceeds collected by the State of Texas;

3. For an amount for reasonable expenses necessarily incurred by each Plaintiff in the prosecution of this action;

4. For all reasonable expenses incurred by each Plaintiff in relation with these proceedings, plus all reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d); and TEXAS 36.110;

5. For such other and further relief to which each Plaintiff may show himself or herself justly entitled.

The Plaintiffs hereby demand that this matter be tried before a jury.

By: _____

Andrew Grosso, Esq. (Fla. Bar No. 0998583)
ANDREW GROSSO & ASSOCIATES
1101 Thirtieth Street, NW, Suite 300
Washington, D.C.  20007
Telephone: (202) 298-6500
Facsimile:  (202) 298-5599
Email: Agrosso@acm.org
*Attorney for Plaintiffs-Relators Julia Flores
and Joseph Pettigrew*

Dated:  October 29, 2018

**EXHIBIT LIST**

| No. | Description |
|---|---|
| 1 | HPS Certificate of Formation |
| 2 | MJL Texas LLC Ohio Certificate of Formation |
| 3 | NMH Phase 2 MOB LLC Certificate of Formation |
| 4 | 1303 North Mound, LLC Texas Certificate of Formation |
| 5 | 1018 North Mound, LLC Texas Certificate of Formation |
| 6 | 1002 North Mound, LLC Texas Certificate of Formation |
| 7 | Sale – Leaseback Targets Nacogdoches Memorial Health |
| 8 | Binding Letter of Intent |
| 9 | Purchase Agreement (October 13, 2016) |
| 10 | First Assignment and Assumption of Purchase Agreement (October 13, 2016) |
| 11 | Lease Agreement for the Guniganti Building |
| 12 | Second Assignment and Assumption of Purchase Agreement (May 5, 2017) |
| 13 | Assignment of Warranties and Guarantees |
| 14 | Purchaser's Final Statement issued by the Chicago Title Insurance Company |
| 15 | Operating Agreement for 1303 Mound |
| 16 | Assignment and Assumption of Lease, Stearns 16 |
| 17 | Purchase Agreement for Sale and Leaseback |
| 18 | Lease for 1018 North Mound Street |
| 19 | Walker Lease |
| 20 | First Lease for the Coussons Building |
| 21 | Assignment and Assumption of Purchase Agreement |
| 22 | Second Lease for Coussons Building |
| 23 | Cost Report Fiscal Year ending June 30, 2017 (FY 2017) |